versed and a new trial granted, with costs to appellant to abide the event.

CLARKE and MILLER, JJ., concur.

INGRAHAM, P. J. I concur with Mr. Justice LAUGHLIN that there must be a new trial of this case on the ground that there was evidence that the note of June 13, 1907, was without consideration, and that the note of January 13, 1908, was also without consideration, for the reasons stated by Mr. Justice LAUGHLIN in his opinion. I dissent, however, as to the competency of the evidence to affect the liability of the defendant as to the second note sued on.

The evidence is undisputed that by that note the defendant promised to pay to the plaintiff the sum specified; that that note was actually discounted for the benefit of the defendant; that he received the proceeds thereof; and the rule that parol evidence could not be received to contradict the express provisions of a written instrument prevented the defendant from proving that the note by which he promised to pay the plaintiff a sum of money at a specified time was without consideration because when the note was given the plaintiff promised to pay it when due.

SCOTT, J., concurs.

---

PEOPLE ex rel. GRIFFITHS et al. v. BOARD OF SUP'RS OF ONEIDA COUNTY.

(Supreme Court, Appellate Division, Fourth Department. March 22, 1911.)

COUNTIES (§ 124*)—COUNTY BOARD—COMMITTEE—CONTRACTS—RATIFICATION.
The county board of supervisors appointed a committee of its members to erect a hospital. The committee awarded a contract therefor to relators, and, after work was begun, the State Board of Charities required changes in the plans which increased the cost nearly three-quarters. The changes were adopted by the county board on report of its committee, showing all its action, including the original letting of the contract. Subsequently a number of the relators' requisitions for payments on account were audited and paid by the board, after a visit to the building, and with full knowledge of the situation. Other contracts for lighting, heating, and sewers for the building were also let to other parties, and finally the building was completed and accepted by the architect. *Held* that, whether or not the committee of the board could let the contract for the building, their acts in so doing had been ratified by the full board, so that relator's claim for payment was improperly rejected.

[Ed. Note.—For other cases, see Counties, Dec. Dig. § 124.*]

Certiorari by the People, on the relation of Griffith Griffiths and another, to review the action of the Board of Supervisors of Oneida County in disallowing bills for balance due under contract for the construction of a hospital in connection with the county almshouse, etc. Reversed, and bills allowed and ordered paid.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Kernan & Kernan and Warnick J. Kernan, for relators.
A. L. McAdam and Edwin H. Risley, for defendants.

WILLIAMS, J. The action of the defendants in rejecting relators' bills should be reversed and the bills allowed and ordered paid, with interest from December 23, 1909, with costs. The writ was granted February 5, 1910, on a petition by the relators made that day. At an annual session of the board, December 10, 1907, a public hearing was had as to the necessity of a hospital building in connection with the almshouse. December 24, 1907, a resolution was passed by the board that the chairman appoint a committee of five, the chairman being one, to inquire as to the necessity of such a hospital, to confer with the State Board of Charities and request plans and specifications, and to obtain estimates of the cost of construction, to report at the next session of the board with their opinion. A committee was appointed under the resolution consisting of the chairman, Lorin, and McCrary, Clark, Swancott, and Hyde, and was designated the "Hospital Committee." The board adjourned without day. The committee organized, employed a clerk, and entered upon the performance of its duties. At a special session of the board held February 20, 1908, the committee submitted its report with its opinion that a hospital building should be erected, and asked that the committee be authorized to construct the hospital. The report was adopted. The committee thereupon proceeded to secure plans, procure their approval by the State Board of Charities, advertise for bids for the construction, and upon the coming in and opening of the bids they awarded the contract in question to the relators for $83,550, and June 11, 1908, a written contract was executed by the full committee and the relators, the party of the first part being named the board of supervisors, on behalf of the county, by the committee. The work under the contract was commenced June 20, 1908. The State Board of Charities interfered, and required a change of the plans, and such change increased the contract price of the hospital to $144,692. August 10, 1908, the relators made a requisition for work performed under the contract of $21,250, being 85 per cent. of $25,000. In October, 1908, the committee advertised for bids and made contracts with parties other than the relators for plumbing, gasfitting, hot water supply, sewers, and electric light fixtures. November 11, 1908, the board convened in its regular annual session. December 8, 1908, the committee invited the full board of supervisors to visit and examine the new hospital, then being constructed, and December 16, 1908, such visit was made, and an inspection of the building was had. December 17, 1908, the committee presented a full report to the board, setting forth all that they had done, the contract originally made with relators, the change made on the requirement of the State Board of Charities, and the other contract for plumbing, etc. This report was approved of, received, and adopted. December 22, 1908, the committee of the board on accounts examined and audited the accounts of the newspaper for advertising the bids for the contracts made by the hospital committee, and these bills were by resolution of the board ordered paid. December 31, 1908, the said committee of the board on accounts examined

and audited 18 bills, aggregating $94,957.62, for services rendered and expenses incurred in the construction of the hospital, which included three requisitions of the relators, the one already referred to, August 10, 1908, of $21,250, another October 6, 1908, of $25,500, the third November 23, 1908, of $37,500, and requisition upon the contract for plumbing, etc., and amount paid for blue prints and architect's inspectors, watchman, etc. All these bills were by resolution of the board allowed and ordered paid. Bills aggregating $29,907.95 for ventilating system for the hospital were also audited by the committee on accounts, and by resolution of the board allowed and ordered paid. The board finally adjourned January 5, 1909, and the regular session of 1908 was ended.

Thereafter the sessions of the board were under a new law to be held quarterly in February, May, August, and November in place of one annual session in November. No action was taken with reference to the hospital at the regular session in February, 1909. The work was proceeding under the various contracts. A special meeting of the board was held April 30, 1909, at which the hospital committee presented a written report, which was received and filed. Reference was made therein to the question of the right of the committee to let the contracts and construct the hospital, which had recently been suggested, and to the matter of heating and ventilation of the building, bids for which had been received, but remained unopened, to await the action of the board. No action was taken by the board with reference to the hospital. The main object of the special meeting was to consider another subject. May 12, 1909, the board met in its regular quarterly session. The attorney for the board submitted an opinion, at the request of a supervisor, to the effect that the original action of the hospital committee in constructing the hospital and making the contract with relators was unauthorized and illegal, but that they had very likely been ratified by the board which had full authority in the matter, and suggesting that the question would be brought before the court if the board refused to audit further bills under the contract. A resolution was thereupon offered that all work on the hospital be discontinued until further action by the board, but was not adopted. Then the board passed a resolution that it would not audit any claims or pay any bills for material or services in connection with the hospital until the legality of the contracts, and the bills or accounts had been passed upon by the courts and determined to be valid and binding claims against the county, and this without any prejudice to any of the bills. The work on the hospital was continued. October 4, 1909, the board in special session directed its clerk to advertise for bids for heating and ventilating the hospital, and thereafter at a special session, October 19, 1909, the bids were opened and the contract let for $18,-000. In November, 1909, the hospital was completed and was accepted by the architect, who certified the contract had been fully performed by the relators. November 19, 1909, at a regular quarterly session of the board, bills were presented by the relators, one of $62,242 for balance on contract and two others of $2,848.61 and $142.80 for extra work. These bills were duly verified by the relators and were ap-

proved and certified to by the architect and the hospital committee. December 21, 1909, the hospital committee made its final report to the board, giving full figures, etc. On the same day the various hospital bills were reported by the committee of the board on accounts, and on December 23, 1909, a motion to allow the bills was lost and the bills rejected altogether. Many bills connected with the hospital, other than the relators', were audited and paid by the board after the rejection of the relators' bills.

This general statement of facts seems to indicate that we have here a clear case for the application of the rule of ratification. We are not inclined to follow the defendants' counsel through the little details of facts upon which he interposes all sorts of technical objections to the doing of justice to these relators. There is no dispute as to the items of their accounts. They were not rejected because the items were in any respect incorrect, but upon the ground that there having been a question raised as to the liability of the county for the bills, and its counsel having suggested such a course might be pursued, the board would refuse to audit and pay them until they were held by the courts to be valid and binding against the county. The county has a building worth substantially all the contract provided should be paid for its construction. It may be larger than the county needed, but that is no fault of the relators. They did not assume to dictate as to the dimensions or expense of it. The hospital committee under the guidance of the State Board of Charities and with the full knowledge of the board of supervisors passed upon and settled these questions. The contract has been fully performed by the relators, and now we are asked to decide that the balance to be paid on the contract and extras, aggregating $65,233.41, cannot be enforced by reason of want of power in the committee to make the contract and to construct the building and by reason of innumerable technical objections and reasons covering pages and pages of the record and defendants' brief. The board itself had full power to construct this building and make contracts therefor. It appointed a committee to have direct charge of the business, and all the parties then supposed the committee was acting within its legal authority in making the contract and carrying on the construction. The board knew what was being done, went in a body and inspected the work, and then approved of the action of the committee, and paid large amounts made by the committee under the contract and in the construction. There came a time, however, when the county was stirred up by the institution of investigations as to the dealing with county funds by public officials. The attention of the board was directed to the question whether the contract with the relators should not have been made by the board itself, instead of the hospital committee, and therefore it refused to pay out further money on account of the contract until the courts said it should do so. There was no objection to such a course if the board wanted to put upon the county the expense of a litigation. But it seems to me beyond doubt that there was a complete ratification by the board of the action of its committee, and that the county is liable for the relators' bills.

The opinion of the counsel for the board was a very fair one, and

128 N.Y.S.—41

would have led the board to pay these bills, I should suppose, if it had not been for the peculiar condition of the public mind in the county at that time.

Action of the defendants in rejecting the relators' bills reversed and the bills allowed, to be paid with interest from December 23, 1909, with $50 costs and disbursements. All concur.